Devise.

## Wright, Plaintiff in Error, v. Denn, ex dem. Page, Defendant in Error.

J. P., by his last will, after certain pecuniary legacies, devised as follows : " Item, I give and bequeath unto my loving wife M., all *the rest of my lands and tenements* whatsoever, whereof I shall die seised in possession, reversion, or remainder, *provided she has no lawful issue.* Item, I give and bequeath unto M., my beloved wife, whom I likewise constitute, make, and ordain, my sole executrix of this my last will and testament, *all and singular my lands, messuages, and tenements, by her freely to be possessed and enjoyed,"* &c. " and I make my loving friend, H. J., executor of this my will, to take care, and see the same performed, according to my true intent and meaning," &c. The testator died seised without issue, and, after the death of the testator, his wife M. married one G. W., by whom she had lawful issue. *Held*, that she took an estate for life only under the will of her husband, J. P.

Where there are no words of limitation to a devise, the general rule of law is, that the devisee takes an estate for life only, unless, from the language there used, or from other parts of the will, there is a plain intention to give a larger estate.

To make a pecuniary legacy a charge upon lands devised, there must be express words, or a plain implication from the words of the will

ERROR to the Circuit Court of New-Jersey. 1825.

This was an action of ejectment brought in the Wright

Court below. The sole question arising upon Denn.

v.

the state of facts in the cause, was upon the construction of the will of James Page, made on the 15th of February, 1774. By that will, after the usual introductory clause, the testator proceeds as follows: " Item, I give and bequeath unto my beloved sister, Rebecca, 100 pounds, proclamation money, to be paid in four years after my decease.

" Item, I give and bequeath unto my beloved sister Hannah, the sum of 50 pounds, proclamation money, to be paid when she is of age.

" Item, I give and bequeath unto my sister, Abigail, the like sum of 50 pounds, proclamation money, to be paid when she arrives at age.

" Item, I give and bequeath unto my loving wife Mary, all the *rest* of my *lands* and *tenements* whatsoever, whereof I shall die seised, in possession, reversion or remainder, *provided she has no lawful issue.*

" Item, I give and bequeath unto Mary, my beloved wife, whom I likewise constitute, make, and ordain, my sole executrix of this my last will and testament, *all and singular my lands, messuages and tenements,* by *her freely to be possessed and enjoyed;* and I do hereby utterly disallow, revoke, and disannul, all and every other former testaments, wills, legacies, and bequests, by me in any ways before named, willed and bequeathed, ratifying and confirming this, and no other, to be my last will and testament. And I make

my loving friend, Henry Jeans, of the county and province aforesaid mentioned, executor of this my will, to take care and see the same performed, according to my true intent and meaning ; and for his pains," (leaving the sentence incomplete.) " In witness whereof," &c. (in the common form of attestation.) The testator was seised of the land in controversy at the time of the will, and died seised, without issue, on the 10th day of October, 1774, leaving his wife Mary, the devisee, who, afterwards, married one George Williamson, by whom she had lawful issue still living, and died in the year 1811. The lessor of the plaintiff is the brother of the testator, and his only heir at law. The defendant claims title to the premises as a purchaser under Mary, the wife of the testator.

The title of the testator to the premises was derived from a devise in the will of his father, John Page, dated the 11th of November, 1773. That will, among other things, contained the following clause : " Item, I give and devise unto my son James, one equal half part of my land, (comprising the land in controversy,) with all my plantation, utensils, &c. &c. *to him, his heirs and assigns, for ever.*" He then gives the other moiety of the land to his son John, to *him, his heirs and assigns.* He then bequeaths several legacies to his daughters, Sarah and Mary, and adds, " Item, I give and bequeath to my three daughters, *Rebecca, Hannah,* and *Abigail,* Rebecca the sum of 50 pounds, Hannah and Abigail the sum of 50 pounds each of them. *Like-*

*wise it is my will, that my son James do pay Han-* 1825.
*nah and Abigail the said sum of fifty pounds* Wright
*each, when they come of age."* He then con- v.
cludes h?s will by appointing an executor, and Denn.
revoking all former wills, &c. ; and died soon af-
terwards. James (the son) left no other real es-
tate than that devised to him by this will. What
personal estate he or his father left, at the times
of their decease, was not found in the case; and,
therefore, it did not appear whether or not it was
sufficient to pay the legacies in their wills.

The Court below gave judgment for the lessor
of the plaintiff, who was the heir at law of the
testator, and the cause was brought, by writ of
error, to this Court.

Mr. *Wood,* for the plaintiff in error, contend- *Feb. 21st.*
ed, that Mary, the wife of the testator, took a
fee simple under the devise.

It was admitted, that a devise of land, without
any technical words of limitation, or explanatory
words, gives only an estate for life. But the in-
tention of the testator will supersede this rule,
and is the polar star to guide in the construction
of wills. The local legislature were so impressed
with the good sense of this principle, that, in
1783, a few years after the making this will, they
passed a statute, declaring that a devise of lands
should pass a fee, unless it was expressed to be
for life only. Courts ought, therefore, to be libe-
ral, in considering the explanatory words and
circumstances relied on, to show an intention to
devise the fee ; by so doing, they further the in-

tention of the testator.[a]  Greater certainty is not attained by a rigid than by a liberal construction of devises.  The only mode of arriving at certainty is, by admitting a general devise to pass a fee, or by requiring strict technical words of limitation.  The notion that descent is the general rule, and devise the exception, is more specious than solid.  They are both distinct, co-ordinate rules.

He would first examine the clauses of the devise in question separately, and then consider their combined operation.

The words, " all the rest of my lands and tenements, whatsoever, whereof I shall die seised, in possession, reversion, or remainder," &c. are sufficient to pass a fee.  The words *rest*, and *in reversion or remainder*, ought not to be rejected, if a meaning can be discovered for them.  The devise of all the *rest* of his lands to his wife, clearly imports, that the previous pecuniary legacies shall be a charge on the lands, and that his wife shall be entitled to whatever interest remains after the legacies are paid.  A charge on lands may be implied in a will.[b]  An estate tail in lands may be created by implication from a proviso ;[c]  *a fortiori*, a charge may be implied.

*a* Richardson v. Noyes, 2 *Mass. Rep.* 59.  Doe v. Richards, 3 *Term Rep.* 359.  *Willes' Rep.* 140.  Goodright *v.* Allen, 2 *W. Bl.* 1042.

*b* Smith v. Tinsall, 2 *Salk.* 685.  1 *Ves. Jr.* 440.  *Prec. in Ch.* 430.  Alcock v. Sparhawk, 2 *Vern.* 229.  2 *Dall.* 131.

*c* Chapman's case, *Dyer*, 333.  Ring v. Rumbal, *Cro. Jac.* 148

These lands were already charged in the hands of the testator with the payment of other legacies, by the will of his father, John P., and which were not then due. The clause in question then is, as it purports to be, a general residuary clause, in which the testator means to devise all his remaining interest in his real property. He could not have meant the *rest* of his lands by way of local description, for he had devised none before; but he meant all the remaining interest in the lands after the legacies were deducted. Wherever it appears that the testator intended to devise all his interest in land, a fee simple passes. This rule applies with increased force to residuary clauses, in which a greater latitude of construction is allowed.[b] Though the words *lands and tenements* are strictly descriptive of locality, yet, in connexion with other expressions, especially in a residuary clause, they may refer to the quantity of interest or estate.[c] The words, *in remainder or reversion*, aid the construction. Though the testator might not have been acquainted with the precise technical distinction between them, yet he must have known they

1825.

Wright
v.
Denn.

[a] Lambert's lessee v. Paine, 3 *Cranch's Rep.* 97. Sargent v. Town, 10 *Mass. Rep.* 305.

[b] Lessee of Willis v. Bucker, 2 *Binn.* 464. Lambert's lessee v. Paine, 3 *Cranch's Rep.* 129. Hogan v. Jackson, *Cowp. Rep.* 299. Grayson v. Atkinson, 1 *Wils. Rep.* 333.

[c] Cooke v. Gerard, 1 *Lev. Rep.* 212. Ludcock v. Willows, *Carther's Rep.* 50. 2 *Ventr. Rep.* 285. Wheeler v. Waldron, *Allen's Rep.* 28. Chester v. Chester, 3 *P. Wms.* 46. Strode v. Russel, 2 *Vern. Rep.* 621. Rooke v. Rooke, *Ibid.* 461.

1825.

Wright
v.
Penn,

meant an estate in expectancy. The case of *Norton* v. *Ladd*[a] is very analogous to the present, and shows that a fee was intended.

If it be established, that the testator referred to his interest or estate in the farm in question in this clause, it carries all his interest, i. e. a fee simple, because it is residuary, and the language is broad and comprehensive enough for the purpose.

Again; the proviso, " provided she has no lawful issue," shows an intention in the testator to give a fee to his wife. This is a condition precedent to take effect at the time of his death; (1.) Because the terms used ordinarily import a condition precedent. Where there is nothing in the nature of the proviso, or in respect to the time of its performance, to show that a condition subsequent was intended, it is always construed a condition precedent. (2.) All the circumstances of the case show, that the testator intended the condition to take effect at his death, and to be precedent; for then the issue the devisee might have, would be his own child and heir. If it be contended, that this proviso refers to children the devisee might have by a future husband, the testator is made guilty of the absurdity of intending, that if his wife should marry again, she might retain the land, but if she should have issue by such marriage, she should forfeit it. The devise to the wife in this case, was intended to be a substitute for the descent to the

*a Lutw. Rep.* 755.

heir. Whenever a devise of land is intended as
a substitute for a fee, the substituted devise is a
fee.[a] A Court may discover, in a condition, the
effect of which is, in a certain event, to defeat
the estate, an intent, when the estate actually
vests, to enlarge the disposition to a fee. Thus,
as before shown, a devise may be enlarged to an
estate tail by the terms of a condition.[b]

But, to leave no doubt of his intention, the
testator, in the next sentence, gives the devisee
his land, " to be by her *freely possessed and en-
joyed*." He drops the peculiar phraseology of the
former clause, and takes up new language, mani-
festly for the purpose of enlarging the subject of
his bounty. A life estate is susceptible only of
a partial and limited enjoyment. The words
" freely to be enjoyed," have been held sufficient
to carry a fee.[c] The idea, that these words, as
used in the present case, give a life estate *dis-
punishable for waste*, is wholly inadmissible. It
would be creating a state of things which would
make the interest of the tenant at variance with
the permanent improvement of the soil, and, con-
sequently, of the best interests of the country.
It would be his interest to commit waste, and to
destroy the property. The testator could not
have meant that the devisee should hold the lands

1825.

Wright
v.
Denn.

*a* Moore v. Heaseman, *Willes' Rep.* 152. Green v. Armstead,
*Hob.* 65. Ibbetson v. Beckwith, *Cas. temp. Talb* 157.

*b* Chapman's case, *Dyer*, 333. King v. Rumbal, *Cro. Jac.*
448.

*c* Loveacre v. Blight, *Cowp.* 352. Willis v. Bucker. 2 *Binn.
Rep.* 464.

1825.

Wright

v.

Denn.

as tenant for life, dispunishable for waste merely; for that would only exempt the property devised from one kind of restriction, when he manifestly contemplates a free enjoyment generally, without any restriction whatever. The free enjoyment is not annexed to the estate devised, but to the land. It is the land which is to be freely enjoyed. The estate is only the technical medium through which that free enjoyment is secured, and the Court will see that the devisee takes such an estate as is compatible with a free enjoyment.

But, even supposing these different clauses, taken separately, should be deemed inadequate to pass a fee, yet, taken conjointly, they form a body of evidence, strong and conclusive, to show that the testator intended to devise his entire interest in the lands. It is impossible to suppose that a plain man would have used such phraseology merely to give his farm to his wife for her life. All the clauses may be taken together, and receive their full, combined effect. *Juncta valent.*

Mr. *Webster* and Mr. *Cox,* contra, contended, that under the will of James P., nothing more passed to the devisee than an estate for life. The plaintiff below claimed as heir at law. The title was, *prima facie,* in him. It was admitted on all hands, that the devise contains no words of limitation sufficient to pass the inheritance. It is a general rule, that in order to create an estate in

*a* Frogmorton v. Holliday, 1 *H. Bl.* 540

fee, words of inheritance, as "heirs," must be
employed.   Wherever an estate is granted, either
specifically for the life of the grantee, or without
any limitation, the legal presumption is, that the
design was to create an estate for life only.   In
wills a greater latitude has been allowed.   The
intention of the testator, expressed in clear, un-
ambiguous terms, will carry the fee.   But the
rules of conveyance at common law still operate,
although not so rigorously, even in regard to
wills; and, before the heir can be disinherited,
there must be, not merely an intention, but an in-
tention legally perceptible, in an instrument le-
gally executed.   The only difference between
wills and deeds is, that in the latter, certain spe-
cific technical terms are essential; in the other,
any words legally indicating the clear intention of
the testator, are sufficient.

   The intent must be clearly expressed, for it is
a fundamental rule in the construction of wills,
that the heir cannot be disinherited without ex-
press words, or necessary implication.   This in-
tention must also be expressed in language at
least *quasi* technical; for it is perfectly immate-
rial how plain it may be, that the design of
the testator was to pass a larger estate, unless
that intention be manifest to the legal eye.[b]

   As the construction now contended for by the
plaintiff in error would disinherit the heir at law,

   a *Cro. Car.* 368.  2 *Bl. Rep.* 839.  2 *Bos. & Pull.* 247.
*Dougl.* 736.   *Cowp.* 235.
   b 1 *Cowp.* 355.  3 *T. R.* 359.  5 *Bos. & Pull.* 349

and vest the inheritance in a stranger, it is incumbent upon him to establish one or the other of these two propositions:

1. That there are express words creating an estate in fee in the devisee, (which is not pretended, and which, if actually existing, would preclude all argument,) or,

2. An intent, so clearly expressed as to require, by necessary implication, that such an estate should pass.

The circumstance, that no words exist in this will, which, by their intrinsic force, carry any larger estate than for life, raises a legal presumption, that no larger interest was intended to pass. If the testator had designed the heirs or issue of his wife as the objects of his bounty, some language indicating such an intention would have been used. If, in addition to this negative circumstance, we find that these persons in that capacity were present to the mind of the testator, and yet are not made objects of his bounty, it superadds a positive weight to the legal presumption that they were not designed to be so, and that their omission was not merely accidental.

There being, then, no express words carrying the fee, let us examine those particular expressions which are relied upon to show the actual intent that the fee should pass. These words are, (1.) " All the *rest* of my lands and tenements ;" (2.) The words " reversion or remainder ;" (3.) The words " freely to be possessed and enjoyed."

1. As to the words, " all the *rest* of my lands

and tenements." One of the earliest cases in which the effect of similar words came under consideration, was that of *Wilkinson* v. *Maryland.*[a] There, A. being seised of divers lands in A., B. and C., the lands in C. being in him by mortgage forfeited, devised the lands in A. and B. to several persons, and then devised " all the *rest* of the goods, chattels, leases, estates, and mortgages, whereof he was possessed," to his wife, after his debts and legacies paid, made his wife executrix, and died. The question was, whether the fee passed to the wife by this devise ; and it was held, that an estate for life only passed. In that case, there were several circumstances rendering it stronger in favour of a fee than the present. (1.) There was a previous clause devising part of the property, and there was, therefore, an antecedent to which the word *rest* could relate. Here there is no such prior clause, and the word *rest* is senseless, or the testator attaches to it his own peculiar signification. (2.) The devise of the real property is there in the same clause which contains a bequest of the personalty ; and, therefore, the inference as to the testator's intention was irresistible, that he designed to give the same interest, i. e. an absolute interest, in all the subjects of the devise. (3.) In the case cited, the word *estate* is employed as the descriptive term, which is a word frequently held sufficient of itself, *proprio vigore,* to carry a fee.

a *Cro. Car.* 447. 323,

1825

Wright
v.
Denn.

The case of *Canning* v. *Canning*,[a] is very similar to the present. There the words of the will were, " All the *rest, residue, and remainder, of* my messuages, lands, or hereditaments, &c. after my just debts, legacies, and funeral expenses first paid, I give to my executors in trust for my daughters." It was adjudged, that the executors took only an estate for life ; and, notwithstanding the general character of *Mosely*, as an inaccurate reporter, this case has been frequently recognised as law.[b] This is evidently a much stronger case than the one now before the Court. (1.) It is properly a residuary devise ; this is not. (2.) It contained the term *hereditaments*, emphatically embracing the inheritance, according to the opinion of many eminent lawyers. (3.) The estate was devised " after debts, legacies, and funeral expenses first paid." Yet, under all these circumstances, it was held, that the words " rest, residue, and remainder of my messuages, lands, or hereditaments," so much stronger and more comprehensive that those of the present testator, were merely descriptive. The ground of that determination was, that the words *rest, residue, and remainder*, being unaccompanied by any words of limitation, could not operate on the inheritance.[c] This applies, with at least equal force, to the present case. In *Peiton* v. *Banks*,[d] where one devised to his wife for life, and the

a  *Mosely*, 240.
b  2 *Bos. & Pull.* 251.
c  2 *Bos. & Pull.* 251. Per Macdonald, C. B.
d  1 *Vern. Rep.* 65.

*reversion* to A. and B., to be equally divided, &c. it was decreed, that they were tenants in common for life only. That case, and the one referred to by Sergeant Maynard, were stronger than the present, since the freehold having been already disposed of, it might have been plausibly argued, that the term reversion there used, *ex vi termini*, necessarily included the inheritance. In this case no such argument would apply, the word *rest* being without an antecedent, and being a term more appropriate, as descriptive of the subject than of the quantity of interest. In *Doe* v. *Richards*,[a] where, after bequeathing a certain leasehold estate, the testator devised " all the rest, residue, and remainder of my messuages, lands, tenements, hereditaments, goods, chattels, and personal estate whatsoever," the Court held, that these words were not sufficient to carry the fee. The property thus devised being, however, made subject to a charge, this circumstance was held sufficient, although the propriety of that part of the decision seems to have been questioned.[b] But the authority of the case, so far as it determines that these words were insufficient, of themselves, to pass the fee, has never been controverted. In that case, the clause was properly a reversionary clause, a previous devise having been made, leaving a reversionary interest to be disposed of. There also the word *hereditament* was used; neither of which circumstances exist here.

a 3 *Term Rep.* 355.     b 5 *Bos. & Pull.* 349.

The next case is that of *Den* v. *Moor*,[a] which deserves the more weight as an authority, because a second action was afterwards brought on the same title; the judgment rendered in the K. B. reversed in the Exchequer;[b] and that judgment afterwards reversed in the House of Lords, and the original judgment in the K. B. affirmed.[c] It may, therefore, be presumed to have been thoroughly examined and considered. In that case, the testator having first devised a life interest in a copyhold messuage, then uses these words : " all the rest of my lands, tenements and hereditaments, either freehold or copyhold, whatsoever and wheresoever, my goods, chattels, and personal estate, of what nature or kind soever, after payment of my just debts and funeral expenses, I give, devise, and bequeath the same unto my wife S. C., and I do hereby nominate and appoint her, my said wife, sole executrix of this my will." In delivering the opinion of the twelve judges, Macdonald, C. B. states the question arising under that will to be, " Whether the words are materially distinguishable from those used in other wills, and which have been held not to denote an intention so expressed by the testator, as to enlarge that which would, otherwise, be an estate for life only, into a fee ?" He then states, that this would depend upon the effect of the word *rest*, of the word *hereditaments*, and of the provision " after payment of my just

a 5 Term Rep. 558.        b 1 Bos. & Pull. 558
c 2 Bos. & Pull. 247.

debts and funeral expenses." He considers
*Canning* v. *Canning*, as decisive of the question
on the two first words. These two cases must,
therefore, be considered as decisive in settling
the construction to be given to this part of the
present will; in which the phraseology used is
still less indicative of an intent to pass the inhe-
ritance. The word *hereditaments*, found there,
is wanting here; a word which, in *Lydcott* v.
*Willows*, Powell, J. considered as sufficient to
carry the fee, and this opinion was unanimously
confirmed in he Exchequer Chamber.[a] So, also,
Lord Holt considered it as sufficient to pass the
fee, in *Smith* v. *Tindal*;[b] and in *Frogmorton* v.
*Wright*, Lord C. J. De Grey held it might have
that operation.[c]

Notwithstanding these decisions, however, the
law, as recognised in *Canning* v. *Canning*, is
considered as settled in Westminster Hall, and
the word *hereditaments* is now held insufficient
to pass the fee.

The case of *Markant* v. *Twisden*,[d] is, in ma-
ny respects, analogous to that now before the
Court. A., having settled all his freeholds on his
wife for life, as a jointure, bequeathed several
legacies, and then says, " all the rest and residue
of my estate, real and personal, I give to my wife,
whom I make sole executrix." Held, that the
reversion of the jointure lands did not pass, but
the personal estate only. The reason assigned

*a* 2 *Ventr. Rep.* 28.    *b* 11 *Mod. Rep.* 103.
*c* 3 *Wils. Rep.* 418.    *d* *Gilb. Eq. Rep.* 30.

Wright
v.
Denn.

appears decisive of the present question, " for, as the testator devised no real estate, there could be no residue." So, in the present case, the whole effect of the words *rest, remainder*, and *reversion*, (if it should be thought that in themselves they have any to denote an estate larger than one for life,) is destroyed: (1.) By the circumstance that there was no previous disposition of any real estate in the will, and therefore this is not a residuary clause. (2.) By the circumstance that the testator was seized of no estate in reversion or remainder, which could pass under these words, and therefore they are wholly inoperative. (3.) It is perfectly manifest, that the words in question were used simply as descriptive of the subject matter, and not of the interest in that subject matter. In this view the case has a strong resemblance to *Pettiward* v. *Prescott*,[a] where the testator devised as follows: " I give to R. P. my copyhold estate at P., consisting of three tenements, and now under lease to A. B." The Master of the Rolls, after showing, from a variety of adjudged cases, that the word *estate* is sufficient to carry the fee in general, yet decides that the devisee took only a life interest, on the ground that the testator, by the word in that case, did not mean to speak of the quantity of the legal interest, but merely of the *corpus* or subject in the disposition.

As corroborating the construction of the words *reversion and remainder*, now insisted on, it may

a *7 Ves. Rep.* 541

be observed, in the Statute of Wills of the 32d Hen. VIII. c. 1. it was enacted, " that all and every person and persons *having* manors, lands, tenements, or hereditaments, may give and dispose of them," &c. Afterwards, the stat. 34 and 35 Hen. VIII. c. 5. entitled, " An act for the explanation of wills," was passed. This statute recites, that several doubts, questions, and ambiguities, had arisen upon the previous statute, and enacts, that " all and singular persons having a sole estate, or interest in fee simple, &c. of or in any manors, lands, tenements, rents, or other hereditaments, in possession, reversion, remainder, &c. shall have full and free liberty to give, dispose, will," &c. In the first statute, it seemed to be thought, that the language implied a present vested estate in the devisor, in order to give validity to this form of disposition. The ambiguity was removed by the second statute, which gave the right, whether the party was seised in possession or in expectancy. The statute, then, authorizes a testator to devise an estate in which he has no present, but only a reversionary interest; but the same language must be used to carry the fee, as if the estate were in possession. The subjects capable of being devised are enlarged, but the form of the instrument is not altered. A reversionary interest, like a possessory interest, may be for life, for years, in tail, or in fee; and it is equally important, that these different quantities of interest should be designated by the will, in the one case, as in the other. The

1825.

Wright
v.
Denn.

1825.

Wright
v.
Denn.

case of *Ager* v. *Poole*,[a] shows this construction to be correct; and *Peiton* v. *Banks*[b] is to the same effect. Both of these cases are stronger than the present, for in each of them the testator had such a future interest as he described.

As to the words " provided she has no lawful issue," the argument on the other side is, that they imply a condition precedent. To this it is answered, (1.) That if a condition precedent to the vesting of any estate in the wife, the proviso would be entirely at variance with the whole design of the testator. He evidently intended an immediate interest to pass to the wife, which could not take place, if the fact that she should have no lawful issue is to be a condition precedent. That could only be ascertained by her dying without issue. (2.) If it be a condition precedent, she took no estate, because she, in point of fact, had lawful issue. To obviate these conclusions, an interpolation is made in the will, and the testator is presumed to have said, lawful issue by himself. The answer is, that such a presumption is not warranted by the language employed. The case of *Norton* v. *Ladd*, turns upon the extent to be given to the expression " whole remainder," after a disposition of a life estate in all the lands, and the interest of an heir at law was not involved. *Lambert's lessee* v. *Paine*, turns upon the meaning to be attached to the word *estate*. *Wheeler* v. *Waldron* is deprived

*a* 3 Dyer, 371.          *b* 1 Vern. 65.

of much of its authority by a remark made in a note to *Chester* v. *Chester*.[a]

As to the second clause of the will, which contains the words, "to be by her freely possessed and enjoyed," the legal signification of this phraseology has been frequently settled. In *Loveacres* v. *Blight*[b] is a clause to this effect: "Item, to my two sons, T. M. and R. M., whom I make and ordain my sole executors, all my lands and tenements freely to be possessed and enjoyed alike." In this case there were, (1.) Introductory words, which Lord Mansfield always considered as entitled to much weight. (2.) There was a charge, and he thought it but reasonable to infer an intention to pass a fee, because that alone would enable the devisees to comply with the testator's directions fully and completely. (3.) *Freely to be enjoyed*, he considered, in that case, as meaning absolutely, because, having charged the estate, it could not mean free from encumbrances. None of these circumstances exist here, and, therefore, the case is not analogous, and cannot warrant the same construction. The case of *Goodright* v. *Barron*,[c] more nearly resembles the case before the Court. There, after the introductory words "as touching my worldly estate," the testator devised to B., whom he made his executrix, "all and singular his lands, messuages, and tenements, by her freely to be possessed and enjoyed." These are the identical words here employed, and no other distinc-

---

a 3 *P. Wms.* 56.    b *Cowp.* 352.    c 1 *East*, 220

tion exists between the cases, than that here are no introductory words, (sometimes so important,) yet the Court held that the fee did not pass.

The only other ground on which it can be presumed that the testator intended a fee, is the circumstance that this devise is after certain legacies; and it is said, that "all the rest," &c. means, that the devisee was to take the real estate subject to the payment of these legacies. Admitting, that wherever the testator employs language of an indefinite kind, prescribing no limits to the estate devised, and burthens the devisee with a gross, but certain charge, that the fee will pass, that rule of construction is inapplicable here, because, (1.) There is no disposition of the personal estate, the appropriate fund for the payment of legacies. (2.) There is, at most, only an implied charge upon the real estate; and it seems unreasonable to require the Court to imply a charge, for no other purpose than to furnish a ground for raising another implication still more serious.

Admitting the verbal construction of the opposite counsel to be correct, the case of *Jackson* v. *Harris*[a] is decisive against the conclusion they would infer from it. If a charge at all, it is a contingent charge. The personal property is applicable in the first instance, and there is only a possibility that it will prove insufficient. A contingent charge is not sufficient to carry a fee. Besides, supposing the whole of these legacies

a 8 *Johns. Rep.* 141.

to be payable out of the real estate, the conclusion contended for would not result. The rule of law is, that where the charge is upon the estate, and not upon the person of the devisee in respect of the estate, no fee passes by implication." So much of the estate as is sufficient to raise the sum required, is not given to the devisee at all. The residue is devised perfectly unfettered. *Canning* v. *Canning*, *Den* v. *Moore*, and *Den* v. *Allen*, were all cases in which the real estate was given after payment of debts, &c. and yet held not a fee.

Mr. Justice STORY delivered the opinion of the Court, and, after stating the case, proceeded as follows :

*March 4th.*

The principal question arising in this case is, what estate Mary, the wife of James Page, took under his will ; whether an estate for life, or in fee. If the former, then the judgment of the Circuit Court is to be affirmed ; if the latter, then it is to be reversed.

Some reliance has been placed upon the will of John Page, the father, to show the predicament of the land in the possession of his son James, and thence to draw aid in the construction of the will of the latter. Without doubt, James took a fee in the moiety devised to him by his father, (which includes the land in controversy,) for it is given " to him, his heirs and as-

*The will of John P., the father, affords no aid in the construction of the will of James P.*

*a* Jackson v. Ball, 10 *Johns. Rep.* 148. Den v. Allen, 8 *Term Rep.* 497. Merson v. Blackmore, 2 *Atk.* 341.

1825.

Wright
v.
Denn.

signs." But, it is argued, that the land came into his hands charged with the legacies payable to his sisters Hannah and Abigail, and as these legacies were not payable until they came of age, they remained a charge upon the land in the hands of James at his death. Whether the sisters were of age at his death or not, or had received their legacies or not, does not appear from the statement of facts, and nothing can be presumed either way. But what is there to show that these legacies were a charge on the land? The direction in the will is, that " James do pay Hannah and Abigail the said sum of 50 pounds each when they come of age ;" but it is not said or implied any where in the will, that these legacies shall be a charge on the land. The direction is personal, and must be a charge on the person only, unless it can be shown, from other parts of the will, that the testator intended a charge on the land. A testator may devise lands with a view to legacies, and make them a charge on the land, or on the person of the devisee, or on both ;[a] and whether a particular legacy be in either predicament, must depend upon the language of the will. In the large class of cases which have been decided on this subject, and which has principally arisen from questions respecting the quantity of the estate taken by the devisee, the ground assumed has been, that the will must speak expressly, or by fair implication,

To make a legacy chargeable upon land devised, there must be express words, or a fair implication from the terms of the will.

[a] See Roe, ex dem. Peter, v. Day, 3 M. & S. 518. 5 East's Rep. 87. 4 East's Rep. 495.

that the testator intends the legacies to be a charge on the land. When, therefore, the testator orders legacies to be paid *out of* his lands, or where, *subject* to legacies, or *after* payment of legacies, he devises his lands, Courts have held the land charged with the legacies upon the manifest intention of the testator. But here there is no such language. There is no direction that the devisee shall pay the legacies *out of* the land. The charge is personal; and the case falls directly within the authority of *Reeves* v. *Gower*, in 11 *Mod. Rep.* 208.

1825.

Wright
v.
Denn.

We may, then, proceed to the consideration of the will of James Page, inasmuch as that of his father affords no light to guide us in the construction. The grounds mainly relied on to establish that Mary, the wife of the testator, took a fee, are, that the legacies given to his sisters are a charge on his real estate in the hands of his widow; that *all the rest* of his "lands and tenements," in possession, reversion, or remainder, are given; that the devise is subject to the proviso, "that she has no lawful issue," which is not a condition merely, but a substitution for an estate intended for his children; and, finally, that the lands, &c. are devised to her "freely to be possessed and enjoyed," which words are best satisfied upon the supposition of a fee.

Before proceeding to the particular examination of the legal effect of these different clauses in the will, it is necessary to state, that, where there are no words of limitation to a devise, the general rule of law is, that the devisee takes an

General rule as to what words will carry a fee.

estate for life only, unless, from the language there used, or from other parts of the will, there is a plain intention to give a larger estate. We say a plain intention, because, if it be doubtful or conjectural upon the terms of the will, or if full legal effect can be given to the language without such an estate, the general rule prevails. It is not sufficient that the Court may entertain a private belief that the testator intended a fee ; it must see that he has expressed that intention with reasonable certainty on the face of his will. For the law will not suffer the heir to be disinherited upon conjecture. He is favoured by its policy; and though the testator may disinherit him, yet the law will execute that intention only when it is put in a clear and unambiguous shape.

*An introductory clause, showing an intention to dispose of the whole of the testator's estate, will not attach itself to a subsequent devising clause, so as to enlarge the latter to a fee.* In the present case, there is no introductory clause in the will, expressing an intention to dispose of the whole of the testator's estate. Nor is it admitted, that such a clause, if it were inserted, would so far attach itself to a subsequent devising clause, as *per se* to enlarge the latter to a fee, where the words would not ordinarily import it. Such a doctrine would be repugnant to the modern as well as ancient authorities. The cases of *Frogmorton* v. *Wright*, (2 W. Bl. 889.) *Right* v. *Sidebottom*, (Dougl. 759.) *Child* v. *Wright*, (8 D. & E. 64.) *Denn* v. *Gaskin*, (Cowper, 657.) *Doe* v. *Allen*, (8 D. & E. 497.) and *Merson* v. *Blackmore*, (2 Atk. 341.) are full to the point. The most that can be said is, that where the words of the devise admit of passing a greater interest than for life, Courts will lay

hold of the introductory clause, to assist them in ascertaining the intention. The case of *Hogan* v. *Jackson*, (*Cowper*, 297.) admits this doctrine. That case itself did not turn upon the effect of the introductory clause, but upon the other words of the will, which were thought sufficient to carry the fee, particularly the words, " all my *effects*, both real and personal." The case of *Grayson* v. *Atkinson*, (1 *Wils. Rep.* 333.) admits of the same explanation; and, besides, the inheritance was there charged with debts and legacies.

There is no doubt, that a charge on lands may be created by implication, as well as by an express clause in a will. But then the implication must be clear upon the words. Where is there any such implication in the present will? The testator has not disposed of the whole of his personal estate, which is the natural fund for the payment of lagacies; *non constat*, how much or how little he left. For aught that appears, the personal estate may greatly have exceeded all the legacies; and if it did not, that would be no sufficient reason to charge them on the land. It is not a sound interpretation of a will, to construe charges which ordinarily belong to the personalty, to be charges on the realty, simply because the original fund is insufficient. The charge must be created by the words of the will. Now, from what words are we to infer such a charge in this case? It is said, from the words " all the rest;" but, " all the rest" of what? Certainly not of the personal estate, because the words im-

mediately following are, " of my lands and tene-
ments," which exclude the personalty. The
words, " all the rest," have then no appropriate
meaning in reference to the personal estate, for
the connexion prohibits it. Can they then be
supposed to import " all the rest of my lands, &c.
*after* payment of the legacies," and so be a
charge on them? This would certainly be going
much farther than the words themselves au-
thorize, and much farther than any preceding
clause requires or justifies. A charge of legacies
on land would not be a devise of the real estate
in the ordinary understanding of men, nor in the
contemplation of law. It would make them a
lien on, and payable out of, the land; but it would
still be distinguishable from an estate in the
land. But it is sufficient for us to declare, that
we cannot make these legacies a charge on the
land, except by going beyond, and not by follow-
ing, the language of the will; we must create
the charge, and not merely recognise it. The
case of *Markant* v. *Twisden*, (*Gilb. Eq. Rep.*
30.) was much stronger than the present. There,
the testator had *settled all his freeholds* on his
wife for life, as a *jointure;* and by his will he
bequeathed several legacies, and then followed
this clause, " all the rest and residue of my *estate,*
chattels, real and personal," I give to my wife,
who I make sole executrix. But the Court
held, that the wife did not take the reversion of
the jointure by the devise, for as the testator had
not in the preceding part of the will devised any

real estate, there could be no *residue* of real estate, on which the clause could operate.

But, admitting that the present legacies were a charge on the lands of the testator, this would not be sufficient to change the wife's estate into a fee. The clearly established doctrine on this subject is, that if the charge be merely on the land, and not on the person of the devisee, then the devisee, upon a general devise, takes an estate for life only. The reason is obvious. If the charge be merely on the estate, then the devisee (to whom the testator is always presumed to intend a benefit) can sustain no loss or detriment in case the estate is construed but a life estate, since the estate is taken subject to the encumbrance. But if the charge be personal on the devisee, then if his estate be but for life, it may determine before he is reimbursed for his payments, and thus he may sustain a serious loss. All the cases turn upon this distinction. *Canning* v. *Canning*, (*Moseley's Rep.* 240.) *Love-acres* v. *Blight*, (*Cowp. Rep.* 352.) *Denn, ex dem. Moor*, v. *Mellor*, (5 *D. & E.* 558. and 2 *Bos. & Pull.* 227.) *Doe* v. *Holmes*, (8 *D. & E.* 1.) *Goodtitle* v. *Maddem*, (4 *East's Rep.* 496.) all recognise it. And *Doe & Palmer* v. *Richards*, (3 *D. & E.* 356.) proceeds upon it, whatever exception may be thought to lie to the application of it in that particular case. We are then of opinion, that there is no charge of the present legacies on the land; and, if there were, no inference could be drawn from this circumstance to en-

1825.

Wright
v.
Denn.

Effect of the
words, "all
the *rest* of my
lands," &c.

large the estate of the wife to a fee, since they are not made a personal charge upon her.

The next consideration is, whether the words, "all the *rest* of my lands and tenements," &c. import a fee. In the first place, this clause is open to the objection, that it is not a residuary clause in the will, for no estate in the lands is previously given, and consequently, if it operates at all on the fee, it gives the entire inheritance, and not a mere residuum of interest. And if a devise of "all the rest and residue of lands," in a clear residuary clause, was sufficient to carry a fee by their own import, it would follow, that almost every will containing a residuary clause, would be construed, without words of limitation, to pass a fee. Yet, the contrary doctrine has most assuredly been maintained. In *Canning* v. *Canning*, (*Moseley*, 240.) the testator devised as follows : "all the rest, residue and remainder of my messuages, lands, &c. after my just debts, legacies, &c. are fully satisfied and paid, I give to my executors in trust for my daughters;" and the question was, whether these words passed an estate in fee, or for life, to the executors. The Court decided that they passed a life estate only. The authority of this case was fully established in *Moor* v. *Denn, ex dem. Mellor*, (2 *Bos. & Pull.* 247.) in the House of Lords, where words equally extensive occurred; and the authority of this last case has never been broken in upon.

The cases which seem at first view to interfere with and control this doctrine, will be

found upon close examination to turn on other points. Thus, in *Palmer* v. *Richards*, (3 *D. & E.* 356.) where there was a devise of " all the *rest* and *residue* of the testator's lands," &c. his *legacies* and personal expenses being *thereout* paid. Lord Kenyon admitted, that the words " rest and residue," &c. were not sufficient to carry a fee; but he relied on the subsequent words, " legacies, &c. being *thereout* paid," which he considered as creating a charge upon the lands in the hands of the devisee, of such a nature as to carry a fee. In this opinion the Court concurred; and, though this case has been since questioned, on its own circumstances, its general doctrine remains untouched. So, in the case of *Norton* v. *Ladd*, (1 *Lutw.* 755. 759.) where the devise was to A. C., his sister, for life, of all his lands, &c., after the decease of his mother; then to J. C., his brother, " the *whole remainder* of all those lands and tenements," given to A. C. for life, if he survived her; and if not, then " the *whole remainder* and *reversion* of all the said lands, &c. to his sisters, C. E., and A., and *to their heirs for ever*;" the Court held, that a fee passed to J. C. under the devise, upon the ground, that taking the whole will, the words " *whole* remainder" properly referred to the *estate* or interest of the testator undisposed of to his sister, A. C.; and that the words could not relate to the *quantity of lands*, which the testator intended to devise to his brother, J. C., for he had plainly devised all his lands to his sister, A. C., and all the lands he had devised to A. C. he had devised to J. C.

1825.

Wright
v.
Denn.

1825.

Wright
v.
Denn.

so that the words naturally and properly had relation to the quantity of *estate* which the testator intended to give J C., that is, all the remainder, which is the same in effect as all his *estate.* If the words were merely to be referred *to the lands* he intended to devise to J. C., they would be ineffectual, for it was impossible that he could have any remainder of lands, when he had devised all to A. C.; so that they must refer to the *estate* in the lands. Such is the substance of the reasoning of the Court; upon which it is unnecessary to say more, than that the case turned upon the supposed incongruity of construing the testator's words otherwise than as importing the whole remaining interest in the lands, upon all of which lands a life estate was already attached. And the final devise over, which carried a plain fee to the sisters, being a substitution for the former estate to J. C., in the event of his death before the testator, greatly fortifies this interpretation. This case has been much relied on by the plaintiff in error upon the present argument; but it is very distinguishable from that before the Court. There, a life estate was given, and the terms, " whole remainder," had a natural meaning, as embracing the whole remaining interest. Here, on the contrary, there is no preceding interest given in the real estate, and therefore the terms, " all the rest," are not susceptible of that sense. There, a substituted estate, in fee, was clearly given; here no clause occurs, leading necessarily to such a conclusion. All that the case in *Lutwyche,* taken as the fullest autho-

rity, establishes, is, that the words " rest and residue" may, in certain connexions, carry a fee.[a] This is not denied or doubted; but then the words attain their force from their juxta-position with other words, which fix the sense in which the testator has used them. In *Farmer* v. *Wise,* (3 *P. Wms.* 294.) the residuary clause was of " all the rest of his *estate,* real and personal," and the word " *estate*" has long been construed to convey a fee. This Court have carried the doctrine still farther, and adjudged a devise of " all the *estate* called *Marrowbone,*" to be a devise of the fee, construing the words, not as words merely of local description, but of the estate or interest also in the land. *Lambert's lessee* v. *Paine,* (3 *Cranch's Rep.* 79.) *Murray* v. *Wise,* (2 *Vern. Rep.* 564.) *S. C.* (*Prec. in Ch.* 246.) contained a devise, after a legacy, of all the residue of his real and personal *estate,* and rests on the same principle, as do *Beachcroft* v. *Beachcroft,* (2 *Vern. Rep.* 690.) and *Ridart* v. *Paine,* (3 *Atk. Rep.* 486.) In *Willows* v. *Lydcott,* (*Carth. Rep.* 50. 2 *Vent.* 285.) the residuary devise was to A. and *her assigns for ever,* which latter words indicate a clear intention to pass a fee. In *Grayson* v. *Atkinson,* (1 *Wils. Rep.* 333.) there was an introductory clause, purporting the intention of the testator to dispose of *all his temporal estate,* then several legacies were given, and a direction to A. to sell any part of his real and

1825.

Wright
v.
Denn.

[a] See Lord Hardwicke's comments on this case, in Bailis v. Gale, (2 *Vesey's Rep.* 48.)

1825.
Wright
v.
Denn.

personal estate for payment of debts and legacies; and then the will says, as to the rest " of my goods and chattels, real and personal, moveable and immoveable, as houses, gardens, tenements, my share in the copperas works, &c. I give to the said A." Lord Hardwicke, after some hesitation, held it a fee in A., relying upon the introductory clause, and the charge of the debts and legacies on the land, and upon the language of the residuary clause. Whatever may be the authority of this decision, it certainly does not pretend to rest solely on the residuary clause : and its containing a mixed devise of real and personal estate, was not insignificant in ascertaining the testator's intention.

It may also be admitted, that the words " lands and tenements," do sometimes carry a fee, and are not confined to a mere local description of the property. But, in their ordinary sense, they import the latter only ; and when a more extensive signification is given to them in wills, it arises from the context, and is justified by the apparent intention of the testator to use them in such extensive signification. The cases cited at the bar reach to this extent, and no farther. Their authority is not denied ; but their application to the present case is not admitted.

We may, then, take it to be the general result of the authorities, that the words, " all the rest of my lands," do not, of themselves, import a devise of the fee; but, unless aided oy the context, the devisee, whether he be a sole or a re-

siduary devisee, will, if there be no words of limitation, take only a life estate.

We next come to the effect of the words, " in possession, reversion, or remainder," and, as incidental thereto, the effect of the word " tenements." That the term "remainder" may, in some cases, connected with other clauses, carry a fee, has been already admitted, and was the very point in 1 *Lutw.* 755. The same is true in respect to the word " reversion." This is affirmed in the case of *Bailis* v. *Gale,* (2 *Ves. Rep.* 48.) where the devise was, " I give to my son, C. G., the *reversion* of the tenement my sister now lives in, after her decease, and the *reversion* of those two tenements now in the possession of J. C." Lord Hardwicke, in pronouncing judgment, relied on the legal signification of the word " reversion," and that its use by the testator was fairly to be inferred to be in its legal sense, as the whole right of revertor; and he adverted to the circumstance, that the devise was to a child, to whom it could scarcely be presumed the parent intended to give merely a dry reversion, or to split up his interest in it into parts. But, in that case, as in 1 *Lutw.* 755. there were antecedent estates created or existing in the land; and the devise was of a " *reversion*," and not, as in this case, of " all the rest of my lands, &c. in *reversion*," &c. The land now in controversy was not held by the testator as a reversionary estate, but as an estate in possession; and in no way, therefore, can the doctrine help the present case. But there are cases, which are contrary to *Bailis* v. *Gale,* and some-

Effect of the
words, "in
possession, 're-
version, or re-
mainder," &c.

what clash with its authority. In *Peiton v. Banks,* (1 *Vern. Rep.* 65.) the case was, that a man devised his lands to his wife for life, and he gave the reversion to A. and B., to be equally divided betwixt them. The Court decided, that A. and B. took an estate as tenants in common for life only. And Sergeant Maynard stated a similar decision to have been made about twenty years before that time. It is not material, however, to enter upon the delicate inquiry, which of these authorities is entitled to most weight, because the present case does not require it.

The word " tenements," does not carry a fee, independent of other circumstances.

In respect to the word " tenements," it is only necessary to observe, that is has never been construed in a will, independently of other circumstances, to pass a fee. In *Canning v. Canning,* (*Moseley's Rep.* 240.) and *Doe, ex dem. Palmer, v. Richards,* (3 *D. & E.* 356.) and *Denn, ex dem. Moor, v. Miller,* (5 *D. & E.* 558.) *S. C.* (2 *Bos. & Pull.* 247.) the same term occurred, as well as the broader expression, " hereditaments ;" in neither case was the term " tenement," supposed to have any peculiar effect ; and the argument, attempting to establish a fee upon the import of the word " hereditaments," even in a residuary clause, was deliberately overruled by the Court. The same doctrine was held in *Hopwell v. Ackland,* (*Salk. Rep.* 239.)

If, then, it is asked, what interpretation the Court put upon the words " all the rest," in connexion with " lands and tenements ?" the answer is, that no definite meaning can, in this will, be

annexed to them. It is our duty to give effect to all the words of a will, if, by the rules of law, it can be done. And where words occur in a will, their plain and ordinary sense is to be attached to them, unless the testator manifestly applies them in some other sense. But, if words are used by him, which are insensible in the place where they occur, or their common meaning is deserted, and no other is furnished by the will, Courts are driven to the necessity of deeming them as merely insignificant or surplusage, and to find the true interpretation of the will without them. In the present case, the words, " all the rest of my lands and tenements," stand wholly disconnected with any preceding clause. There is nothing to which " the rest" has relation, for no other devise of real estate is made. We have no certain guide to the testator's intention in using them. We may indulge conjectures; but the law does not decide upon conjectures, but upon plain, reasonable, and certain expressions of intention found on the face of the will.

1825.

Wright
v.
Denn.

Where words are used by a testator, which are insensible in the place where they occur, or their ordinary meaning is deserted, and no other is furnished by the will, they must be entirely disregarded.

The next clause is, " provided she has no lawful issue." The probable intention of this proviso was, " provided she has no lawful issue" *by me*. Men do not, ordinarily, look to remote occurrences in the structure of their wills, and especially unlearned men. The testator was young, and his wife young, and it was natural for them not to despair of issue, although, at the time of the will, he was in ill health. In case of leaving children, posthumous or otherwise, he might

think, that the gift to his wife of the whole of his real estate, would be more than conjugal affection could require, or parental prudence justify. In that event, he might mean to displace the whole estate of his wife, and to leave her to her dower at the common law, and the children to their inheritance by descent. This interpretation would afford a rational exposition of the clause, and, perhaps, ought not to be rejected, although there is no express limitation in the words. In this view, it is not very material, whether it be considered as a condition precedent or subsequent, though the general analogies of the law would certainly lead to the conclusion, that it was in the latter predicament. But even in this view, which is certainly most favourable to the plaintiffs in error, it falls short of the purposes of the argument. As a condition, in the event proposed, the prior estate to the wife would be defeated; but there would be no estate devised to the issue. They would take by descent as heirs, and not by devise. It would be going quite too far to construe mere words of condition to include a contingent devise to the issue; to infer from words defeating the former estate, an intent to create a new estate in the issue, and that estate a fee, and a clear substitute for the former. No Court would feel justified, upon so slender a foundation, to establish so broad a superstructure. Nor can any intention to give a fee to the wife be legally deduced from the proviso, in any way of interpreting the terms, because it is as perfectly consistent with the inten-

tion to defeat a life estate, as a fee in the whole of the lands. The testator, with a limited property, might justly think it too much to take from his own issue the substance of their inheritance during a long minority, in favour of a wife, who might live many years, and form new connexions. In such an event, leaving her to the general provision of law, as to dower, would not be unkindness or injustice. But, it is sufficient to say, that the words are too equivocal to enable the Court to ascertain from them the clear purpose of establishing a fee. And if the proviso refers to any lawful issue by any other husband, then it must be deemed a condition subsequent; and in the events which have happened, the estate of the wife, whether it be for life or in fee, has been defeated, and the plaintiffs in error are not entitled to reverse the present judgment. *Quacunque via data est,* the proviso cannot help the case.

It remains now to consider the succeeding clause of the will, in which the testator repeats his devise, and gives to his wife " all his lands," &c. dropping the words " *the rest,*" and, therefore, showing that he did not understand them as having any other or stronger import than the will presented without them. Then follow the words, " by her freely to be possessed and enjoyed;" upon which great stress has been laid at the bar. If these words had occurred in a will devising an estate for years, or for life, or in fee, in express terms, they would not, probably, have been thought to have any distinct auxiliary signification, but to be merely a more full annun-

ciation of what the law would imply. Occurring in a clause where the estate is undefined, they are supposed to have a peculiar force ; so that, " freely to possess and enjoy," must mean to possess and enjoy without any limitation or restriction as to estate or right. The argument is, that a tenant for life is restricted in many respects. She can make no permanent improvements or alterations ; she is punishable for waste, and is subject to the inquisition of the reversioner. But, if this argument is admitted, it proves, not that a fee is necessarily intended, but that these restrictions on the life estate ought to be held to be done away by the words in question. They admit of quite as natural an interpretation, by being construed to mean, *free of encumbrances;* and, in this view, are just as applicable to a life estate as a fee. Perhaps the testator himself may have entertained the notion, that the legacies in his will, or that of his father, were encumbrances on the estate ; and if so, the words would indicate an intention, that the wife should be disencumbered of the burthen. But in what way are we to reconcile the argument deduced from this clause, with that drawn on the same side from the preceding proviso? How could the testator intend, that the wife should " freely possess and enjoy" the lands in fee, when, in one event, he had stripped her of the whole estate, and that by a condition inseparably annexed as an encumbrance to her estate ? We ought not to suppose that he intended to repeal the proviso under such a general phrase. The

case of *Loveacres* v. *Blight,* (*Cowp. Rep.* 352.) has been supposed to be a direct support of the argument in favour of a fee. In that case, the testator made the following devise :· *As touching such worldly estate* wherewith it hath pleased God to bless me in this life, I give," &c. ", in the following manner and form: First of all, I give and bequeath to E. M., my dearly beloved wife, the sum of five pounds, to be *paid yearly out of my estate,* called G., and also one part of the dwelling house, being the west side, with as much wood craft, *home at her,* as she shall have need of, by my executors hereafter named. I give," &c. " unto my son,· T. M., the sum of five pounds, to be paid in twelve months after my decease. I give unto my granddaughter E., the sum of five pounds, to be paid twelve months after my decease. Item, I give unto J. M.,·and R. M., my two sons, whom I make my—— and ordain my sole executors," &c. " *all and singular my lands and messuages, by them freely to be possessed and enjoyed alike.*" The question was, whether, by this clause, the sons took an estate for life, or in fee. The Court held, that they took a tenancy in common in fee. Lord Mansfield, in delivering the opinion of the Court, admitted, that if the intention were doubtful, the general rule of law must take place. But he laid stress upon the circumstance,. that the estate was charged with an annuity to his wife, so that the testator could not mean by the word " *freely,*" to give it free of encumbrances. He thought the free enjoyment must, therefore, mean, free from

Wright
v.
Denn.

all limitations, that is, the absolute property of the estate. He also thought the introductory clause not unimportant; and that the blank after *my* was intended to be filled with "heirs;" and it can scarcely escape observation, that it was a case where the sons of the testator were the devisees. These considerations may well lead to a doubt, whether Lord Mansfield intended to lay down any general principle of construction in relation to the words, "freely to be enjoyed," &c. But, if he did, the subsequent case of *Goodright* v. *Barron,* (11 *East's Rep.* 220.) has manifestly interfered with its authority. In that case, there was an introductory clause, " as touching such worldly estate wherewith it hath pleased God to bless me," &c.; and the testator then proceeded as follows: " I give and bequeath to my brother T. D., a cottage house, and all belonging to it, to him, and his heirs, for ever, W. C. tenant. Also, I give and bequeath to my wife E., whom I likewise make my sole executrix, all and singular my lands, messuages, and tenements, *by her freely to be possessed and enjoyed."* The Court held, that the wife took an estate for life only; that the words, being ambiguous, did not pass a fee against the heir, but might mean free from encumbrances or charges, free from impeachment for waste; and that the introductory clause could not be brought down into the latter distinct clause to aid it, though, if joined, it might have had that effect. The Court distinguished that case from the case before Lord Mansfield, because in the latter, as the testator had already

encumbered the estate, the words must have meant to pass a fee, or they would have no meaning at all. Mr. Justice Le Blanc added, that the words used were not inconsistent with a life estate only; and he distinguished between them and the words, "freely to be disposed of," admitting that the latter would pass a fee. So that, taking both these cases together, the fair deduction is, that the words, "freely to be possessed," &c. are too uncertain, of themselves, to raise a fee, but they may be aided by other circumstances.

The case before us is far less strong than either of the foregoing cases, for there is no introductory clause, showing an intention to dispose of the whole property, as there was both in *Goodright* v. *Barron*, and *Loveacres* v. *Blight*; nor is there any encumbrance created by the testator on the land, which was the decisive circumstance that governed the latter.

Upon the whole, upon the most careful examination, we cannot find a sufficient warrant in the words of this will to pass a fee to the wife. The testator may have intended it, and probably did, but the intention cannot be extracted from his words with reasonable certainty; and we have no right to indulge ourselves in mere private conjectures.

Judgment affirmed, with costs.

[REMISSION OF FORFEITURE.  PLEADING.]

## The UNITED STATES v. MORRIS, Marshal of the Southern District of New-York.

The Secretary of the Treasury has authority, under the Remission Act of the 3d of March, 1797, c. 361. [lvii.] to remit a forfeiture or penalty accruing under the revenue laws, at any time, before or after a final sentence of condemnation or judgment for the penalty, until the money is actually paid over to the Collector for distribution.

Such remission extends to the shares of the forfeiture or penalty to which the officers of the customs are entitled, as well as to the interest of the United States.

In a plea of justification by the Marshal, for not levying an execution, setting forth a remission by the Secretary of the Treasury, of the forfeiture or penalty on which the judgment was obtained, it is not necessary to set forth the statement of facts upon which the remission was founded.

ERROR to the Circuit Court for the Southern District of New-York.

This was an action brought against the defendant, in the Court below, as Marshal of the Southern District of New-York, for a misfeasance in neglecting to proceed on a *venditioni exponas* issued out of the District Court of the United States for the District of Maine, requiring him to sell the goods and chattels of Andrew Ogden, Abraham K. Smedes, and Thomas C. Butler, which he had levied upon by virtue of certain executions issued against them, in favour of the United States, on a judgment recovered in the said District Court of Maine, and which goods and chattels remained in his hands for want

of buyers, according to his return on said executions. The misconduct, or neglect of duty, alleged against the Marshal, was, that he did not sell the property so levied upon, according to the command of the writ, but delivered the same up to the defendants, discharged from the execution. The declaration stated the judgment to have been recovered in the September term of the Court, in the year 1817, for 22,361 dollars 75 cents, damages, and which, in part, to wit, in the sum of 11,180 dollars 87 cents, remained in full force, not reversed, paid off, or satisfied, to the plaintiffs, and that execution to that amount remains to be done. The *venditioni exponas*, as was alleged, was put into the hands of the Marshal on the 13th day of August, 1819.

The pleadings in the cause show, that Andrew Ogden, of the city of New-York, in or about the month of June, in the year 1813, imported into Portland, in the District of Maine, certain goods and merchandise in the brig Hollen, which vessel, as well as the goods, belonged to him. These goods, together with the brig, were thereupon seized as forfeited to the United States, on the ground that the goods had been imported in that vessel, in violation of the non-intercourse acts, then in existence. The goods and vessel were libelled in the District Court of Maine, on the 6th of July, 1813, and on the 19th of the same month were delivered up to Andrew Ogden, after having been regularly appraised, upon his having executed, together with Abraham K. Smedes, and Thomas C. Butler, a bond for their appraised

value. The vessel and goods were, afterwards, on the 27th of May, 1817, condemned as forfeited to the use of the United States. And such proceedings were thereupon had, that, in the following September term of the Court, a judgment was entered upon the bond of appraisement for 22,361 dollars 75 cents, with costs.

The defendant, Morris, pleaded the general issue, and a special plea in justification, that the forfeitures had been remitted by the Secretary of the Treasury, setting out in *hæc verba*, two warrants of remission, which were duly served upon him before the return day of the *venditioni exponas*, and averring a compliance on the part of the defendants, with all the terms and conditions required by the warrants of remission. All which were duly set forth in the return on the *venditioni exponas*, before the commencement of the present suit.

To this special plea, a replication was filed, stating, in substance, that at the time of the forfeiture, seizure, and condemnation, of the brig Hollen, and the goods imported in her ; and, also, at the time of their condemnation, and the entering up of the judgment on the bond for their appraised value, and of the issuing of the several writs of execution, and at the time of the making and issuing the said warrants of remission, and of the service thereof on the defendant, &c. Isaac Ilsley, and James C. Jewett, were the collector and surveyor of the port of Portland, and, as such, entitled to one half of the said forfeiture ; and that the said several executions

were issued for their benefit, and solely to col-
lect the said sum of 11,180 dollars 87 cents, for
their own separate use, and that the defendant
had notice thereof when the said several writs of
execution were delivered to him to be executed;
setting out, also, two endorsements on the execu-
tion, one signed by the District Attorney of
Maine, notifying the defendant, that the execu-
tion was for the benefit of the said Collector and
Surveyor, and directing the Marshal to collect the
same by their order. The other was signed by
the Collector and Surveyor, requiring the Marshal
to collect the execution forthwith, and deposit
the money agreeably to the command of the
writ, and notifying him, that the property in the
execution was in them, and directing him to re-
ceive orders from them, and from no other per-
son whatsoever, in whatever related to the said
execution. And it was then averred, that the
present suit was for the purpose of enabling the
Collector and Surveyor to recover their damages
for the injury they had sustained by reason of the
misfeasance of the defendant, in the declaration
mentioned, and not for the benefit, use, or be-
hoof, of the said plaintiffs.

To this replication the defendant demurred
specially, and stated the following causes of de-
murrer : (1.) For that the replication is a depar-
ture from the declaration, in this, that the decla-
ration proceeds upon a cause of action in favour
of the United States ; whereas the replication
proceeds upon a cause of action in favour of the
said Ilsley and Jewett, &c. (2.) For that the

1825.

United States
v.
Morris.

replication discloses no lawful and sufficient authority for the said I. and J., to prosecute the said action against the said T. M., &c., and in the name of the United States. (3.) For that the declaration proceeds upon the ground, that the several writs of execution therein respectively mentioned, were issued upon a judgment obtained for the use of the United States, and, therefore, according to the act in such case made, &c., might lawfully run and be executed in any other State or territory of the United States, than the said District of Maine, in which the said judgment was obtained. Whereas the replication discloses the fact, that the said judgment was not obtained for the use of the said United States, but for the use and benefit of the said I. and J., and, therefore, could not run and be executed in any other State, &c. (4.) That the suit is prosecuted in the name of the United States, by an attorney, on record, other than the District Attorney of the United States for the Southern District of New-York.

A joinder in demurrer having been filed, judgment was given for the defendant in the Court below, and the cause brought by writ of error to this Court.

On the part of the plaintiff in error, it was contended, that the judgment ought to be reversed,

1. Because the Secretary of the Treasury had no power to remit the share of the forfeiture which belonged to the custom-house officers.

2. Because the action was rightly brought in the name of the United States, by an attorney of

the Court below, specially authorized to prose-
cute the suit by an order of one of the Judges of
that Court.

3. Because the replication is not a departure
from the declaration, proceeding upon a different
cause of action from that stated in the declara-
tion.

Mr. *Wheaton,* for the plaintiffs in error, stated
the principal question in the cause to be, whether,
after a definitive sentence of condemnation, in a
revenue cause, the Secretary of the Treasury has a
right, under the Remission Act of the 3d of March,
1797, c. 361. [lxvii.]ª to remit the forfeiture so as

a Which provides, (s. 1.) " That wherever any person, or per-
sons, who shall have incurred any fine, penalty, forfeiture, or dis-
ability, or shall have been interested in any vessel, goods, wares,
or merchandise, which shall have been subject to any seizure, for-
feiture, or disability, by force of any present or future law of the
United States, for the laying, levying, or collecting, any duties or
taxes, or by force of any present or future act, concerning the re-
gistering and recording of ships or vessels, or any act concerning
the enrolling and licensing ships or vessels employed in the coast-
ing trade or fisheries, and for regulating the same, shall prefer his
petition to the Judge of the District in which such fine, penalty, for-
feiture, or disability shall have accrued, truly and particularly set-
ting forth the circumstances of his case; first causing reasonable
notice to be given to the person or persons claiming such fine,
penalty, or forfeiture, and to the Attorney of the United States for
such District, that each may have an opportunity of showing cause
against the remission or mitigation thereof; and shall cause the
facts which shall appear upon such inquiry, to be stated and an-
nexed to the petition, and direct their transmission to the Secretary
of the Treasury of the United States, who shall thereupon have
power to mitigate or remit such fine, forfeiture, or penalty, or re-
move such disability, or any part thereof, if in his opinion the

1825.     to affect the right of the officers of the customs,
          under the Collection Act of 1799, c. 128. [cxxviii.]
United States
          ss. 89. and 91.,[a] to a moiety of the fines, penal-
   v.
 Morris.

    same shall have been incurred without wilful negligence, or any intention of fraud in the person or persons incurring the same; and to direct the prosecution, if any shall have been instituted for the recovery thereof, to cease and be discontinued, upon such terms or conditions as he may deem reasonable and just." (S. 3.) "That nothing herein contained shall be construed to affect the right or claim of any person to that part of any fine, penalty, or forfeiture, incurred by the breach of any of the laws aforesaid, which such person shall or may be entitled to, by virtue of the said laws, in cases where a prosecution has been commenced, or information has been given before the passing of this act, or any other act relative to the mitigation or remission of such fines, penalties, or forfeitures; the amount of which right and claim shall be assessed and valued by the proper Judge or Court in a summary way."

    a Which provides, (s. 89.) "That all penalties accruing by any breach of this act, shall be sued for and recovered, with costs of suit, in the name of the United States of America, in any Court competent to try the same; and the trial of any fact which may be put in issue, shall be within the judicial District in which any such penalty shall have accrued; and the Collector within whose District the seizure shall have been made, or forfeiture incurred, is hereby enjoined to cause suits for the same to be commenced without delay, and prosecuted to effect; and is, moreover, authorized to receive from the Court, within which such trial is had, or from the proper officer thereof, the sum or sums so recovered, after deducting proper charges, to be allowed by the said Court; and on receipt thereof the said Collector shall pay and distribute the same, without delay, according to law," &c. (s. 91.) "That all fines, penalties and forfeitures, recovered by virtue of this act, and not otherwise appropriated, shall, after deducting all proper costs and charges, be disposed of as follows: one moiety shall be for the use of the United States, and be paid into the Treasury thereof by the Collector receiving the same; the other moiety shall be divided between, and paid in equal proportions to, the Collector

ties, and forfeitures, recovered under the act. He insisted, that the right of the Collector, &c. accruing by the seizure, was consummated by the final sentence of condemnation, and became an absolutely vested right, which could not be devested by the remission after such sentence. This had been expressly determined in the Circuit Court for the First Circuit;[a] and though the case had not hitherto been presented to this Court, there were other analogous cases which settled the doctrine, that, as between the representatives of a deceased Collector, and his successor in office, or as between a removed Collector and such successor, the share of the forfeiture to which he is entitled attaches, and is consummated by the sentence of condemnation.[b] This went upon the principle, that it became an absolutely vested right, by relation back to the time of seizure. If it were an absolutely vested right, it must be vested as against the government. It is not vested, even as against the government, at the time of the seizure. That only gives an inchoate right, which may never become absolute for want of a condemnation, or may be intercepted by a remission before condemnation. The

1825.

United States
v.
Morris.

and Naval Officer of the District and Surveyor of the port, wherein the same shall have been incurred, or to such of the said officers as there may be in the said District; and in districts where only one of the aforesaid officers shall have been established, the said moiety shall be given to such officer," &c.

a The Margaretta, 1 Gallis. Rep. 515. 522. The Hollen, 1 Mason's Rep. 431.

b Jones v. Shore, 1 Wheat. Rep. 462. Van Ness v. Buel, 4 Wheat. Rep. 74.

forfeiture has, for certain purposes, relation back to the commission of the offence.   As between the offender and all persons claiming as purchasers of the property, and the government, the forfeiture attaches at the moment of *delictum*.[a] But this proceeds from the necessary strictness of all fiscal regulations, and does not prevent a remission before condemnation.   The *delictum* does, indeed, devest the proprietary interest from the owner, so as to overreach the claims of subsequent purchasers ; but it does not, therefore, follow, that the share to which the officers of the customs may become entitled, vests in them *eo instanti*.   Their title may never vest, by reason of three contingencies : (1.) There may be no seizure.   (2.) There may be a remission after the offence, and before condemnation.   (3.) There may be no condemnation.   If there be no seizure, of course no title vests.   If there be a remission before condemnation, as no title has yet vested except against subsequent purchasers, it purges the offence entirely, by relation back to the *delictum*.   If there be no condemnation, the inchoate title is never ripened into maturity.   But if there be a remission after condemnation, the rights of the seizing officers have become absolute, and the remission purges the offence (if it has any effect at all) only so far as the government is concerned.

This would appear from the plain reading of the Collection Act of 1799, c. 128. [cxxviii.]

*a 8 Cranch's Rep.* 398. 417.

ss. 89, 90, 91. which directs the Collector to prosecute for breaches of the revenue laws, and to receive the sums recovered, and to pay and distribute the same among the different persons entitled. It must be admitted, on all hands, that the right must absolutely vest at some period. The Court have already rejected the notion that it does not vest until the actual receipt and payment over of the money.[a] There could, therefore, be no other epoch but that of the sentence of condemnation, which, if definitive, or unappealed from, fixes and ascertains the rights of all parties. Admitting, for the sake of the argument, that the government may afterwards remit, so far as its own rights are exclusively concerned; it cannot certainly be concluded, from the terms of the Remission Act, that the government intended to revoke its bounty, conferred absolutely upon its officers by a solemn statute for great purposes of public policy. It is immaterial what the Secretary of the Treasury intended to do. The question is, what was he authorized to do by the law under which he acted.

All the analogies of the common law would be found to repel the idea that the remission could devest the rights which had become ascertained and fixed by the sentence of condemnation. Pardon and remission are synonymous terms, and their legal effect upon the rights of parties must be the same. "Pardon" is defined to be "a work of mercy, whereby the king forgiveth any

---

[a] Jones v. Shore. 1 *Wheat. Rep.* 470.

1825.

United States
v.
Morris.

offence, &c. *right, title, debt, or duty.*[a] The power which is given to the President by the constitution, of granting pardons for offences may, or may not, extend to revenue cases; but whether the pardon is granted by the President, or by his minister, is immaterial. It is still the act of the government, and it can have no greater effect in the one case than in the other. It is laid down that a pardon does not discharge the thing in which the subject has a property or interest; as if a suit be in the Spiritual Court for tithes, a legacy contract, or matrimony, &c.[b] or for dilapidation.[c] So, if an incumbent accepts a plurality, the interest of the patron to present is not discharged by a general pardon.[d] A penalty, upon a conviction for deer stealing, is not discharged by a pardon; for it is a forfeiture to the party grieved. The king cannot, by his pardon, discharge an action commenced *qui tam* upon a penal statute, *except for the king's moiety or part.*[f] Nor penalties to be divided between the informer and the poor of the parish.[g] So a pardon does not discharge a thing *consequent or incident* in which the subject has an interest vested in him; as costs taxed in the Spiritual Court, a pardon of the offence does not discharge the costs.[h] And this, though the party appeals after the taxation of costs, so that the sentence is suspended by the appeal. So, if the party appeals

---

*a* 3 *Inst.* 233.
*b* 5 *Co.* 51. *a.*
*c* 3 *Mod. Rep* 56.
*d* *Cro. Car.* 357. 358.
*e* 1 *Salk. Rep.* 233, 234.

*f* 3 *Inst.* 238.
*g* *Str. Rep.* 1272.
*h* 5 *Co.* 51. *b.* *Cro. Jac.*
159. *Cro. Car.* 199.
*a* 5 *Co. Lit.* 51. *b.*

after costs taxed, and then the pardon comes, and upon the appeal the former sentence is annulled, and costs given to the appellant; these costs are not discharged by the pardon: for the costs being taxed in the original suit, the party had a right of appeal, which was not taken away by the pardon; and, consequently, has a right to the costs.[a] So, on a proceeding *in rem*, in the Exchequer, the crown's share only of a forfeiture is pardoned, by an act of general pardon, but not the informer's on an information previously filed.[b] And in prize proceedings, the condemnation is held to vest the right in the captors so absolutely, that the government cannot release. Thus, in the case of the *Elsebe*, (one of the famous Swedish convoys) Sir W. Scott determined, that the crown might interpose to release the captured vessels *before*, but not *after*, a final adjudication.[c]

As to the technical questions which had been raised by the special demurrer upon the pleadings, they were all involved in the question upon the merits. If the remission was void as to the custom-house officers, they had a right to sue in the name of the United States; or, rather, the latter are suing in their own name, to give effect to their own bounty granted to those officers, who are prosecutors from the beginning in the name of the United States. They are not only privies, but parties, and are concluded by a sen-

1825.

United States
*v.*
Morris.

a *Cro. Car.* 47.  b *Parker*, 280.
c 5 *Rob.* 173.

tence of acquittal as well as of condemnation." But they may also be considered as the assignees of the United States, and then the question whether they are to sue in their own name, or in that of the United States, will depend upon the forms of proceeding in analogous cases. By the civil law, on the cession of a debt, the assignor impliedly ceded to the assignee all his rights of action as incidental to the cession. The assignee became what was called *procurator in rem suam,* and sued in the name of his assignor. So, in England, and in this country, it has long since been settled, that the assignee of a chose in action may sue in the name of the assignor; who has no right to interfere with the suit.[b] By the ancient common law, the king could assign a chose in action, though a subject could not. But the assignee of the king took it with all the high prerogative remedies. Thus, it is laid down, that the king's grantee may sue an obligation, &c. granted to him, in his own name, or may prosecute in the king's name; " for the grant of the statute, or debt, is a warrant to him to prosecute process in the king's name."[c] Thus, where a debt due to an outlawed person was granted by the king; held, that the grantee might levy it in his own name, or, by extent, in the king's name. "although he hath not any words in his

---

*a* Hoyt v. Gelston, 3 *Wheat. Rep.* 319.

*b* 1 *Johns. Cas.* 411. 2 *Johns. Cas.* 121. 3 *Johns. Rep.* 425. Bottomley v. Brooke, 2 *Bl. Rep.* 1271. 1 *Wheat. Rep.* 233. 1 *Term Rep.* 619. 621. 622.

*c* *Cro. Jac.* 82.

grant to sue it in the name of the king, as is
usual in such cases."[a]

As to the alleged departure in pleading, which
is relied on as one of the causes of demurrer,
the objection is, that the replication sets up a
cause of action in the custom-house officers,
whilst the declaration proceeds on a cause of ac-
tion for the United States.   The answer is, that
the suit being here brought in the name of the
United States, whose duty and interest it is to
prosecute for the benefit of the officers, (who are
their grantees,) notwithstanding the remission,
the cause of action stated in the replication is
just as much in favour of the United States as
that set up in the declaration.   How, then, stand
the pleadings?   (1.) The declaration setting up
a cause of action in favour of the United States.
(2.) A plea of remission by the United States.
(3.) A replication, admitting the fact of remis-
sion, and affirming the cause of action in favour
of the United States, as set up in the declaration,
*with a new circumstance,* viz. a right of third
persons, which invalidates the remission so far
as they are concerned.   This new matter is as-
serted, not by the officers, but by the United
States themselves, who sue precisely as if the
parties had not performed the conditions on
which the remission was granted, and it had be-
come totally void.   It was not necessary that
this new matter should have been stated in the

a *Cro. Jac.* 179, 180.   *Com. Dig.* tit. *Assignment*, (D.)

1825.

United States
v.
Morris.

declaration. In declaring, it is only necessary to set out enough to maintain the action. In an action for not executing a writ of execution, it is sufficient to set out the judgment, execution, and facts of neglect or misfeasance. Even stating the judgment is merely inducement. It is sufficient to state concisely the circumstances which give rise to the defendant's particular duty or liability.[a] The remission was a matter of defence which it was incumbent on the defendant to set forth. Successive pleadings are designed for this very purpose. The office of the declaration is to set forth the cause of action merely, of the plea to avoid it, and of the replication to avoid the plea. Thus, in debt on bond for the performance of covenants, the plaintiff declared for the penalty. The defendant craved oyer, and pleaded general performance. The plaintiff replied, setting forth particular breaches, and it was held good.[b] The declaration in the present case pursues the most approved forms, and with more circumstantiality than usual.[c] Departure is where the plea contains subsequent matter, which does not maintain or fortify the matter in the declaration.[d] But here it does maintain it, and, at the same time, avoids the bar. The bar is remission; the replication shows, that it is no answer to the declara-

a  1 *Chitty's Plead.* 369,
b  Post Master General v. Cochran, 2 *Johns. Rep.* 413.
c  See 2 *Chitty's Plead.* 203—206,
d  Co. *Litt.* 304. a.

tion. In *Winch* v. *Keeley*,[a] in assumpsit, defend-
ant pleaded, that plaintiff had become a bank-
rupt, and assigned all his effects, under the sta-
tute, to his legal assignees ; plaintiff replied, that
the suit was brought by him for the use of ano-
ther party, to whom he had transferred the debt
before the bankruptcy. The replication was
held good, and the objection of departure was not
even mentioned at the bar.

On the part of the defendant, it was insisted,
that the judgment ought to be affirmed, for the
following reasons :

1. Because the Secretary of the Treasury had
a right to remit the forfeiture in question, not-
withstanding the judgment of condemnation pre-
viously rendered, as stated in the pleadings.

2. Because, the whole case, on the part of the
Collector and Surveyor of Portland, proceeds on
the ground, that the remission by the Secretary
is binding upon the United States, and discharges
their moiety of the forfeiture ; but has not that
effect on the other moiety claimed by them ; thus
giving a construction to the remission, inconsist-
ent with its own terms, and the act under which
it was granted. According to that act, the re-
mission must be valid to the whole extent of the
power exercised under it, or not at all ; as it is,
admitted, therefore, to be good in part, it follows
that it is good for the whole.

3. Because such a remission is not like a par-
don, nor is it to be governed by the same rules ;

*a* 1 *Term Rev.* 619.

1825.

United States
v.
Morris.

but is equivalent to the judgment or decree of a competent tribunal, that no forfeiture should be enforced, inasmuch as it was without wilful negligence, or any intention of fraud, in the person or persons incurring the same.

4. Because, as far at least as it relates to the act of Congress, vesting in the Secretary of the Treasury the remitting power, as therein mentioned, the custom-house officers have no vested rights in any forfeiture, until not only condemnation, but the receipt of the money produced by a sale of the forfeiture, or collection of the bond substituted for it, before which time the Secretary has full power to remit; and, having exercised it in this case, the Collector and Surveyor of Portland are equally bound by it as the United States.

5. Because, if the said Collector and Surveyor of Portland had any vested rights in the forfeiture in question, notwithstanding the remission, then they ought to have enforced them by an action in their own name, and not in that of the United States.

6. Because, the condemnation of the brig and goods being to the use of the United States, and the recovery in the bond being also in the name of the United States, they became trustees for the Collector and Surveyor of Portland, for whatever rights or interest they had therein; and these, whatever they were, were discharged by the remission of the Secretary, inasmuch as the release of a trustee is, at

law, a bar of the rights or interest of his *cestui* 1825. *que trust,* and especially in a case where fraud is neither charged nor pretended.

7. Because, this being an action to recover damages for a misfeasance, if the United States themselves could sustain it, yet, it being, in its nature, incapable of assignment, they could not transfer to the said Collector and Surveyor such right of action, and authorize its prosecution in their name ; much less can it be prosecuted without any such assignment or authority.

8. Because, if the United States could themselves sustain such an action, the said Collector and Surveyor would be entitled to no part of the damages recovered ; for such damages would not be the forfeiture, nor the proceeds of the bond which was substituted for it ; to a share of which only they are by law entitled. Of course, therefore, they cannot sustain the present action to recover damages for their own private benefit, in the name of the United States, which, if recovered by the United States, they would be entitled to no share of.

Mr. *Emmett* and Mr. *D. B. Ogden,* for the defendant, stated, upon the first point, that it was remarkable, and might be useful for interpreting the law, that the question as to the power of the Secretary to remit, after sentence, was never raised until subsequently to the judgment of this Court in *Jones* v. *Shore,*[a] and more especially

*a* 1 *Wheat. Rep.* 462.

1825.

United States
v.
Morris.

until after what fell from Story, J. in the *Marga-retta.*[a] That no such doubt was conceived to exist at the bar before the case of *Jones* v. *Shore*, appears from the arguments of all the counsel in that case, which admit, that the right was not so vested as not to be defeated by a remission. An expression there attributed to Mr. Pinkney ' as to the President's power of pardoning, leads to an examination of the distinction between this power of remission and the pardoning power. The power of pardoning is a prerogative given to the President by the constitution, analogous to that exercised by the British, and other sovereigns. It is an act of grace and mercy; founded on the fact of guilt and crime, but exercised from other considerations than those which govern a remission by the treasury. It is laid down, that " the king, by his prerogative, may grant his pardon to all offenders attainted or convicted of a crime, *where he has hope of their amendment.*"[c] The remission proceeds on the ground of moral innocence, and is to be only a consequence of it. The Secretary of the Treasury has no power whatever, except where, in his opinion, from the judicial statement of facts, the forfeiture " shall have been incurred without wilful negligence, or any intention of fraud in the person or persons incurring the same." A pardon being an act of grace and mercy to an acknowledged criminal, it is but just

*a* 2 *Gallis. Rep.* 516.          *b* 1 *Wheat. Rep.* 462.
*c Comyn's Dig. Pardon*, (A.)

that it should not disturb the rights of others, founded on the fact of that guilt, and their industry in detecting it; but where the remission is founded on moral innocence, the justice of the case is the other way. In this respect, there ought to be no difference whether a condemnation was had or not; for, although a sentence of condemnation may establish a violation of the letter of the revenue laws, the remission proceeds on the ground, that it establishes no guilt, and the petition for the remission must admit all the facts on which conviction could be founded. The remission is intended to be, and is, in fact, a judicial decision. It is the policy of the revenue laws to make certain *acts* subject to forfeiture and penalties. It adopts this course, in order to relieve the government from the *onus* of proving, that those acts were coupled with a criminal intent; and to oblige the party suffering to prove the innocence of his mind, by such evidence as would satisfy the proper officer of the government itself. In analogy to the jurisdiction of a Court of equity to take cognisance of a judgment at law, and relieve against it on principles which the Courts of law could not have taken into consideration, the Secretary of the Treasury is empowered to administer equitable relief, on principles which the revenue Courts could not apply; but which go to the entire destruction of all guilt, and ought, therefore, to go to the entire remission of all punishment. The preliminary proceedings are all judicial, by petition to the District Judge, and by examinations before him

and, like an analogous suit in equity, all parties interested are brought before the Court to assert

their rights, and contest the justice of the application. The officers of the customs, having notice, and the liberty of contesting the matter, are parties to the suit or application, and can no more complain that they are deprived of vested rights, than they could where a Court of equity decreed a perpetual injunction on a judgment at law.

The statute, having thus provided for making all persons interested parties to the suit, uses the most general language possible to cover the entire remission of the forfeiture. The prayer of the petition extends to the remission of the whole, and the power given to the Secretary is to remit " *such* fines," &c. The proviso in the 3d section shows the extent to which it was intended to protect vested interests, or to consider them as vested, viz. where a prosecution had been commenced, or information given, before the passing of the act. Every information, seizure, or prosecution, subsequent to the passing of the act, was followed up, subject to the provisions of that act. It formed a limitation upon the extent of vesting the interests of the prosecutors, or, to use the expression of one of the counsel, in *Jones* v. *Shore,*[a] " it is a condition originally attached by the law;" and attached, whether the interest became originally vested by the seizure, the condemnation, or the recovery, and receipt of the money.

a 1 *Wheat. Rep.* 467.

·To what extent is the vesting? It is decided 1825.
in *Van Ness* v. *Buel*,[a] that the Collector acquires United States·
an *inchoate* right by the seizure, which, by the v.
subsequent decree of condemnation, gives him Morris.
an absolute vested title to his share in the for-
feiture; and it is also determined, in *Jones* v.
*Shore*,[b] that the right to share in the forfeitures
and penalties is given to the Collector who made
the seizure, and not to him in office on the re-
ceipt of the money. These adjudications were
as between officers themselves, and not between
an officer and the owner of the thing seized. But
they establish the principle, that the right made
absolute by condemnation was that, and *only
that*, which had become inchoate by seizure.
That inchoate right was, under the statute, sub-
ject to be destroyed by remission according to
its provisions, and therefore that made absolute
must be subject to the same provisions.

But the vesting of the right, as laid down in
the case of the *Margaretta*,[c] does not take place
before a *final* judgment or sentence; and the
same epoch is assigned in the case of the *Elsebe*,[d]
for the vesting of prize interests in cases of cap-
ture. Now, prize Courts can take notice of all
equitable considerations, but a revenue Court
cannot. Notwithstanding condemnation, then,
it remains to be inquired, whether there was any
criminal intent. If innocence be alleged, and
the proper proceedings founded on it be insti-

a 4 *Wheat. Rep.* 74.          b 1 *Wheat. Rep.* 467.
c 2 *Gallis. Rep.* 522.        d 5 *Rob. Rep.* 155. *Am. ed.*

tuted, until those proceedings are decided upon, there is no final adjudication, within the spirit and meaning of the act.

Another consideration shows that the remission must operate to extinguish the rights of the officers of the customs. They could maintain no action for the forfeiture as in their own names. The forfeiting party has nothing to do with *them :* he forfeits only to the United States, and it is only as between the United States and the officers, that the latter have any claim. In this respect there is a material difference between our act and the British revenue laws. By the British statute, one half is forfeited to the use of the crown, and the other to the use of the informer. In the Exchequer, the form of proceeding is to adjudge a moiety of the forfeiture to the seizors, or informer, by the sentence itself, and it becomes a vested right in them, by relation back to the filing the information.[a] But in this country, the utmost that can be said is, that the United States are, *pro tanto*, trustees for them ; but as to the forfeiting party, the government is the only legal *actor*. There must be a right of releasing some where. A release by the officers of the customs would not prevent the United States from recovering the whole penalty. Thus, in debt on a single bond made to A., to the use of him and B., the defendant pleaded a release made to him by B.; on which the plaintiff demurred; and without difficulty, it was ad-

*a* Weddel v. Thurlow, *Parker.* 280.

judged for the plaintiff : for B. is no party to the deed, and therefore can neither sue nor release it. But it is an equitable trust for him, and suable in the Chancery, if A. will not let him have part of the money : and the book of Edw. III. cited, that he might release in such case, was denied to be law.[a] Since there must be a power of releasing somewhere, and the officers could not do it, the power must reside in the United States, and the remission is such a release.[b]

Cases have been cited on the other side, in which Courts of law have taken notice of equitable interests, and have permitted them to be pleaded or replied, so as to protect them. All these cases proceed on the ground of fraud and collusion, which cannot be charged here. As to *Bottomley* v. *Brook*, and *Rudge* v. *Birch*,[c] they are said by Mr. Maryatt, in *Schooley* v. *Mears*,[d] to have been overruled in the Exchequer, in the case of *Lane* v. *Chandler* : and in *Wake* v. *Tinkler*, Lord Ellenborough says, " I am much more inclined to restrain than to extend the doctrine of these cases." And Bailey, J. says, " we have nothing to do in this case with any other than legal rights." So in *Bakerman* v. *Radenius*,[e] Mr. Erskine (arguendo) states a case before Lord Mansfield, where an action was brought in the name of a nominal plaintiff by persons benefi-

a Offly v. Warde, 1 *Lev.* 235. S. C. 2 *Keb.* 333.
b Bayley v. Lloyd, 7 *Mod. Rep.* 250.
c Cited in 1 *Term Rep.* 621, 622.
d 7 *East. Rep.* 153.
e 7 *Term Rep.* 662.

cially interested, for whom he was a trustee. At the trial, the defendant produced a release from the plaintiff, which Lord Mansfield held to be conclusive; but said the Court of Chancery, upon application, would make the trustee pay the principal, the debt, if well founded, and the costs of suit. And Lawrence, J. cites a case from *Salkeld*,[a] where Lord Holt said, that if the plaintiff in ejectment, who is considered only as a trustee for the lessor, released the action, he might be committed for a contempt of the Court: " but he did not say the release would not defeat the action." So, in *Paine* v. *Rogers*,[b] where the tenant, a nominal plaintiff, having given a release to the plaintiff, the Court, on application of the landlord, ordered it to be given up; clearly, because if used it would defeat the action. And in *Legh* v. *Legh*, the obligor of a bond, after notice of its being assigned, took a release from the obligee, and pleaded it to an action brought by the assignee, in the name of the obligee. The Court, on motion, set the plea aside, Eyre, C. J. saying, " the only question is, whether the assignee must not seek relief in a Court of equity." Clearly showing, as the whole case does, that the plea could not be replied to at law.

But why should the custom-house officers be entitled to maintain this action in the name of the United States, notwithstanding their release, and having no possible interest in the result?

a *Anony, Salk.* 260.       b *Dougl.* 407.

Why should they have the benefit of not being liable to costs for a false action? They are not assignees of the United States, if that would protect them. There can be no assignment of a test. The injury by the Marshal's return is directly to themselves, and the United States have barred themselves from regarding it as an injury to them by the remission. The right to sue in the name of another only existed where the action would not lie in the name of the party actually interested. But, in every case where the unlawful act of one person does an injury to another, an action on the case lies for the injury. Can the United States, who are not injured, sustain this action? If they could, is such a right of action assignable? Here, however, is no actual assignment; and it can only be considered as analogous to the assignment of a chose in action. But how can the real plaintiffs entitle themselves to the damages recovered in the name of the United States, without such assignment? The law only gives them half the forfeiture or proceeds. How, then, can they, notwithstanding the release or remission by the United States, recover, in their name, damages which they are not legally entitled to participate in? and do so for their own benefit, when, if they have sustained damages, they may sue in their own name?

And this brings us to consider some of the special causes of demurrer. The replication is a departure from the declaration, not only by not bringing forward matter pursuant to it, and fortifying it, but by bringing forward matter showing

1825.

United States
v.
Morris.

no right of action in the plaintiffs, and showing, that if it exists any where, it exists in third persons ; and that this matter was known, and might be made available, before action brought. *Departure* is defined to be, " when the second plea containeth matter not pursuant to his former, and which fortifieth not the same, and, therefore, it is called *decessus*, because he departeth from his former plea."[a] Thus, where the defendant pleads in bar a lease for fifty years made by a corporation ; plaintiff replies, that it was made while a former lease was in existence, and shows the statute 21 *Hen.* VIII., and that the lease for fifty years was void ; not setting forth the proviso making such leases good for twenty-one years. Defendant, in his rejoinder, pleads the proviso of the statute 21 *Hen.* VIII., which makes such leases good for twenty-one years. Held, that this pleading of the proviso was a departure, because it neither goes with, nor enforces the bar before.[b] So, in a *præcipe quod reddat*, the tenant pleads, that the land was devised to him, and the plaintiff replies, that the devisor was an infant ; to this the defendant says, that, by the custom, infants may devise ; and, *per Curiam*, this is a departure, for he ought to have pleaded the special matter first.[c] So, in *Doctr. Plac.* 124. per Keble, *nota*, where general matter is pleaded, and where the special matter might have been

a  *Co. Litt.* 304. *a. Doctr. Plac.* tit. *Departure*, (119.)
b  Fulmarston v. Stuard, *Dyer*, 102. *b.* 103. *a.*
c  *Doctr. Plac.* 123.   37 *H.* VI. 5.

pleaded at the commencement, the party, after-
wards, shall not maintain the general matter with
the special matters.    And if the defendant justi-
fies by distress for rent, and the plaintiff replies,
that he used and sold them, to which the defend-
ant rejoins, that he sold the distress pursuant to
the statute 2 *W.* & *M.,* it will be a departure;
for it should have been alleged so at first.[a]   De-
fendant, in a plea, justified taking cattle *damage
feasant,* and afterwards rejoined, that they were
taken *surcharging the common;* held to be a de-
parture; and one of the reasons was, that the
surcharge might have been pleaded first, because
the defendant then knew the plaintiff's right.[b]  So,
when a man, in his former plea, pleadeth an es-
tate made by the common law, in the second plea,
regularly, he shall not make it good by an act of
parliament.   So, when, in his former plea, he
entitleth himself, generally, by the common law,
in his second plea he shall not enable himself
by a custom, but should have pleaded it at first.[c]

As to the third cause of demurrer, the statute
only enables the issuing of a writ of execution to
another District, upon judgments " obtained for
the use of the United States."  The present
judgment was obtained in their name; but for the
use of other parties.   It is contended, that if the
judgment was for the use of the United States,
the execution need not be so.    But the privilege

a *Com. Dig. Pleader,* (s. 8.)
b Ellis v. Rowles, *Wilkes,* 638.
c *Co. Litt.* 304. *a.*

obviously attaches to the execution, and not to the judgment. It was for the benefit of the government, and was not intended to be communicable to citizens in cases where the United States have no interest. All the rules for construing statutes will bear out this interpretation.[a]

Mr. *Webster*, for the plaintiffs, in reply, insisted, that the authority to sue in the name of the United States could not be disputed by the defendant in this Court. The government was here represented by the Attorney General, and if he did not interfere with the suit, it might well be maintained. It was novel doctrine, that an appearance by a wrong attorney was a ground of demurrer. If it had been intended to take advantage of that objection, a summary application should have been made to the Court below, by whom the attorney on the record had been appointed to prosecute this suit, the District Attorney having refused to prosecute it. The discretionary power exercised by the Court below in this instance, was essential to the administration of justice, whenever the District Attorney refuses to act, or is interested, or in case of his death. But, even if this Court should be of opinion, that the order made in the present case was irregular, it would not, on that account, give judgment against the sufficiency of the plaintiff's replication as pleaded. It would merely direct the pleadings to be amended by inserting the name

[a] *Bac. Abr. tit. Statute. J. 5. Plowd. 18.*

of the District Attorney in the place of the present attorney on the record. The plaintiff's declaration is admitted to be good, and it is unnecessary to consider the replication, since the plea contains the first fault (if any) in the pleadings. It cannot be pretended that it is a good plea, because the plaintiff has declared by a wrong attorney. If this judgment be affirmed, it is a perpetual bar as against the United States, and all others interested. While the cause is allowed to stand on the calendar, the rights of the parties, as stated in the pleadings, must alone be regarded. But the officers of the customs have a right to use the name of the United States. The cases cited in the opening sufficiently show it. Wherever the subject has an interest in a prosecution in which the king's name is necessary as a formal party, the subject has a legal right to use it. All cases of information, not *ex officio*, are of this sort, such as those by the Master of the Crown Office, in *quo warranto*, of intrusion to office, &c. The prerogative of the supreme magistrate is held, not for purposes of ostentation, but for the substantial benefit of society, and its aid may be invoked as often as necessity requires it.

The plea is bad, because the Marshal, who is a mere ministerial officer, was not a competent judge of the validity or effect of the remission. He is the officer of the Court, and not of the treasury. He is to collect the money, and bring it into Court. When it is received in the registry, distribution is to be made of it according to

law; or if the forfeiture has been remitted, the conditions of the remission are to be complied with under the directions of the Court. If the Marshal had levied the money upon the execution, and no remission had been obtained, he could only be compelled to pay it over by a motion to compel him to return the process. If the remission had been unconditional, and could devest the share of the custom-house officers, he had nothing to do with carrying it into effect. It is by the Court only that the rights of the parties are to be ascertained, and their respective claims to be satisfied.

The plea is also bad, because it does not set forth, with proper averments, the facts and circumstances stated in the petition to the Secretary of the Treasury, upon which the remission of the forfeiture was granted. It is an inflexible rule of pleading, that whenever a justification is set up under a special or limited authority, every thing should be set forth to show the case to be within the protection of the authority relied on. The statement of facts on which the remission was grounded, is essential to be known, in order to see whether the Secretary of the Treasury, who also acts merely as a ministerial officer, has pursued his authority. It has, indeed, been argued, that the Secretary acts judicially in those cases, and that his decision is an adjudication binding on all the world, and especially on the officers of the customs, who are both parties and privies. But, how can that be a judicial power, which is merely of executive discretion? The

Secretary *may* remit under the statute, whenever
it is proved to his satisfaction that the offence
was committed " without wilful negligence, or
an intention of fraud;" but he is *not bound* to
remit even in case of innocence ever so clearly
proved.    All judicial power, under the constitu-
tion, is vested in one Supreme Court, and such
inferior tribunals as Congress shall establish.
How, then, can any portion of that power be vest-
ed in the treasury department, or in any other
executive department?

   The plea is bad, because it alleges the remis-
sion after a final sentence of condemnation, and
a summary judgment upon the appraisement
bond.   The Remission Act of Congress was
evidently copied from the British statute of the
27th Geo. III. c. 27.; and under that statute the
Commissioners of the Customs have never exer-
cised the power of remitting a forfeiture after
judgment.[a]   This defect of authority having been
found, in some respects, inconvenient, the power
of remitting after judgment was expressly given
(not to the Commissioners of the Customs, but
to a higher authority,) the Lords of the Treasury,
by the 54th of Geo. III. c. 171.   When it is said,
that the rights of the custom-house officers are
vested from the time of the judgment or sentence,
it is not meant that they are vested independent
of the act of Congress, but under the act, and
according to the act.   If the law authorizes a re-
mission after judgment, it is idle to speak of

_____
   *a. Chitty's Crim. Law,* 798.

1825.

United States
v.
Morris.

rights being vested by the judgment. The question is, what does the act mean? And it is contended, that it limits the power to cases before condemnation. Every clause and phrase of the act is applicable, and alone applicable, to such cases. The persons entitled to the benefit of the act, are those who " *shall have incurred* any fine, forfeiture, or disability, or shall have been interested in any vessel, goods, wares, or merchandise, *which shall have been subject to* any seizure, *forfeiture*, or disability," &c. This cannot refer to things already forfeited. Goods forfeited and condemned, are not *subject* to forfeiture ; they are actually forfeited. So, the words, "*incurred any forfeiture*." No man *incurs* a forfeiture by a judgment against him. It is the offence by which the forfeiture is incurred. So, also, the summary inquiry which is to be made by the District Judge, into the facts and circumstances of the case, shows, that the law supposes that no trial had yet been had. It would be an absurd provision, upon any other supposition. The act authorizes the Secretary to direct the prosecution, if any shall have been instituted, for the recovery of the forfeiture, to cease, and be discontinued. It supposes a prosecution either pending, or not yet brought. The prosecution cannot be said to be pending, in a general sense, after judgment. There is not a single expression in the act applicable to a judgment. But here are two successive judgments, one against the goods, and the other against the claimants, upon the appraisement bond. How can the remission dis-

charge this second judgment? Why was not the
remission shown when the application was made
for that judgment, so as to prevent its being en-
tered? There is nothing in the act to authorize
the remission of a judgment. The subjects to
be remitted are, " fines, penalties, forfeitures,
and disabilities." Besides, the phraseology ap-
plicable to judgments would be, *released*, or va-
cated; not remitted or mitigated. There must be
some limit in point of time, and in the order of
the proceedings, to the exercise of this power of
remission. If the rights of all parties are not
fixed and ascertained by the judgment, it will be
difficult to discover when they are consummated.
The receipt of the money by the officers may
change the possession, but it cannot alter the
right. That idea is expressly rejected by the
Court in *Jones* v. *Shore.*[a]

The argument on the other side, that there
must be a power of releasing somewhere, and
since the Custom House officers cannot do it, the
power must reside in the United States, and may,
therefore, be exercised by the Secretary of the
Treasury, is founded upon an entire misappre-
hension of the distinct powers of the different
branches of the government. There is no au-
thority given by law to any department or officer
of the executive government to release a debt
due by judgment. The Secretary of the Trea-
sury may remit a forfeiture or penalty before
judgment, or may discharge the debtor as to his

a 1 *Wheat. Rep.* 470.

person, but nothing short of the legislative power of Congress, specially exercised, can discharge the debt. The usual course of the Treasury has been, to refuse to remit after judgment, and to refer to the President for the exercise of the pardoning power. It may well be doubted, whether that power extends, under the constitution, to cases arising under the revenue laws. But the practice shows the sense entertained by the Treasury of the limitation to its authority. Whether the President's pardoning power extends to such cases or not, there is a close analogy between a pardon and a remission ; and there is no more reason why one should affect private rights and interests actually vested more than the other. Both suppose legal guilt, and some consideration which makes it consistent with the public good that it should be forgiven. A pardon, as well as a remission, often supposes moral innocence.

As to the execution running out of the District of Maine, not only was the judgment " for the use of the United States," but the execution was for their use. If the forfeiture could not be remitted after judgment, the whole debt is still due, and the United States have a direct interest in a moiety of it. If the forfeiture might be remitted, so far as the share of the United States is concerned, they have still an interest in enforcing the demand, since it is intended to secure to their officers a part of their legal compensation. But this question cannot arise upon the pleadings. The defendant admits that he has

executed the process, so far as the remission did
not prohibit it, and he is therefore estopped by
his plea from insisting that it is a void process.

*Quære,* whe-
ther the exe-
cution upon
the judgment
obtained in the
District Court
of Maine,
could run into
and be execu-
ted in the
Southern Dis-
trict of New-
York.